Ricardo V. VENEY, Appellant,

v.

UNITED STATES, Appellee.

No. 96–CF–1794.

District of Columbia Court of Appeals.

Argued April 22, 1999.
Decided Sept. 2, 1999.

M. Elizabeth Kent, Washington, DC, appointed by this court, for appellant.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Kenneth C. Kohl, and William F. Gould, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and RUIZ, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

A jury convicted appellant Ricardo Veney of second-degree murder while armed,[1] for the killing of Sean Nelson, first degree murder while armed[2] for the killing of Eric Briscoe, possession of a firearm during a crime of violence,[3] carrying a pistol without a license,[4] and escape.[5] Veney appeals asserting: (1) the performance of his trial attorney was adversely affected by an actual conflict of interest; and (2) the trial court committed error in imposing a consecutive sentence for escape. We affirm Veney's convictions, but remand the case in part for resentencing.

## I.

In order to address appellant's allegation that an actual conflict of interest adversely affected the performance of his trial attorney, it is necessary to describe in more than the usual detail the factual basis of the charges, the manner in which the trial court dealt with the allegations of conflict of interest, and the manner in which defense counsel tried the case.

On January 6, 1995, three Metropolitan Police Department Officers, Daryl Isom, Monica Coleman, and John Brown, were about to have dinner at a Chinese restaurant on Pennsylvania Avenue, S.E., when they heard gunshots coming from nearby L'Enfant Square. Officer Isom testified that he saw the first victim, Sean Nelson, fall backwards to the ground. Describing the same incident, Officer Coleman testified that she saw two people standing about five feet apart. She saw the flash of a pistol from one figure as the other fell to the ground.

Officers Isom and Coleman got into their police car to drive to the location of the shooting. Officer Isom then saw Eric Briscoe running from L'Enfant Square, ducking behind cars. While Briscoe was running and looking over his shoulder, a gunman shot him, causing him to fall. The gunman then stood over Briscoe's body and shot him several more times. Officer Isom testified that the lighting was good, and that he saw the face of the gunman. Officer Isom was also able to identify the gunman based on a distinctive hat he was wearing, which had ear flaps and strings. Officer Isom yelled to his fellow officers, who were pursuing the gunman, mentioning the hat. Upon hearing Officer Isom yell to the other officers, the suspect removed the hat. Officer Brown apprehended Veney less than one block from the area where Briscoe had been shot. At

---

1. D.C.Code §§ 22–2403, –3202 (1989 Repl., 1994 Supp.).

2. D.C.Code §§ 22–2401, –3202. (1991 Repl.).

3. D.C.Code § 22–3204(b) (1996 Repl.).

4. D.C.Code § 22–3204(a) (1996 Repl.).

5. D.C.Code § 22–2601(a)(2) (1996 Repl.).

trial, Officer Isom identified Veney as being the man who shot Briscoe. Officers Coleman and Brown identified Veney as the man they arrested.

When Officer Isom broadcast a description of the gunman over the police radio, he stated that the gunman was wearing all black. Similarly, Officer Coleman stated that she believed the shooter wore dark clothing. Veney was wearing a blue sweatshirt (of an undescribed shade), light blue jeans, and tan boots on the night in question.

Christopher Baylor, who lived on Pennsylvania Avenue, "heard gunshots coming from the front door of his house," and looked out of his window. Baylor saw one man running into an alley, and a second man moving away from a body. This second man was chased by police. Baylor saw a third person standing near a drug store, who backed away when the police arrived.

Officer Darrell Smith recovered a Colt 10 millimeter pistol from behind two trash containers when he retraced the path Veney took when he ran away from Briscoe's body. Five 10 millimeter bullets were found in Briscoe's body. Nelson, however, had been shot by a .45 caliber weapon.

At the police station, Veney told detectives that he had been dropped off at the scene by his brother-in-law in an Isuzu Rodeo, and that he was waiting to be picked up by somebody else to take him to a night club. Veney told detectives that he was at a pay phone near the scene when the shootings occurred.

Latif Stone testified on behalf of the government that he had been in jail at the same time that Veney was being held there for trial. He testified that he had a conversation there with Veney, and recounted that Veney stated that a man by the name of Richard Briscoe,[6] who was known as "Bones," had believed that shooting victim Nelson had been responsible for the killing of Steve Strohman, a friend of both Bones and Veney.[7] Stone testified that Veney further stated that Bones called him at home on the evening of the murders and picked him up. Stone testified that Veney also recounted that Bones was paged by Nelson, who wanted to buy drugs, and that Bones agreed to meet Nelson after leading Nelson to believe that Bones would sell him cocaine. According to Stone, Veney said that Bones and Veney intended to ambush Nelson and kill him. Veney stated that Bones dropped him off near the place where Bones was to meet Nelson, so he could be there in case Nelson came that way in an effort to escape. Bones, Veney stated, arrived at the prearranged meeting place and shot Nelson in the face. Meanwhile, Veney stated, another person who was with Nelson, Eric Briscoe, ran toward Veney. Stone testified that Veney said that then "I handled my business" (which suggested, in context, that he shot Eric Briscoe) but that Veney then added that he "didn't shoot the guy." Stone noted that at that point Veney was aware of another person in Veney's cell who "was trying to listen in," and testified that Veney "looked at him [the eavesdropper] and he looked at me [Stone] and he said I [Veney] didn't shoot him."

The government also presented evidence of frequent telephone calls between Bones and Veney. The government showed a total of ninety-five calls between Bones' cellular phone and either Veney's home or Veney's pager. On the night of the murders, the government showed, calls were made between a cellular phone Bones had stolen and Veney's home, Veney's pager, and Nelson's home. The record also shows that Bones was a friend of Veney's mother, with whom Veney lived.

---

6. Richard Briscoe is unrelated to the second murder victim, Eric Briscoe.

7. We will refer to Richard Briscoe as "Bones" because three men with the surname Briscoe figure in the events that came out at trial.

In the early morning of January 7, 1995, while being detained by police, Veney slipped out of the police station. Veney remained at large for two days, turning himself in to police on January 9.

Veney presented a defense of innocent presence. He adduced testimony from Sharmane Minor and LaShawn Henderson that they had picked up Veney on the night of the murders to find a place to eat. Because the three disagreed over where to eat, the women dropped Veney off near an Amoco station on Pennsylvania Avenue. Veney testified that he then heard gunshots, and ran. While moving away from the gunshots, Veney testified, he was apprehended by police.

The issue of conflict of interest first came to the attention of the court before trial when the government filed a motion to disqualify defense counsel or to allow Veney to consult with outside counsel concerning his representation. The government alleged that Veney's counsel, Michael Statham, had a conflict of interest. Specifically, the government contended that Veney did not act alone, but that a second gunman, a "person unknown to the grand jury," shot Nelson. The government alleged that Bones was that person, and that Statham was being paid by Bones to defend Veney.

Statham filed an opposition, stating, "counsel ... vehemently denied and continues to deny that Mr. Briscoe [Bones] had participated in or provided counsel fees" for the defense of Veney. Statham acknowledged that he had previously defended Bones in unrelated criminal charges in Maryland. He indicated that at that time Bones had gone by the alias of Tyrone Briscoe.

On the date that the first assigned judge, Judge Arthur Burnett, had scheduled the case for trial, he held a hearing instead on the government's motion.[8] Judge Burnett voiced his skepticism about the government's allegations. He asked the Assistant U.S. Attorney, "Has there been any [corroboration]? Sometimes people shoot off their mouth when it doesn't have any truth to it." The government did not reply to this question. Judge Burnett continued to express his doubts:

> But what concerns me is the fact that sometimes people do a lot of brouhaha in the community and there is no truth whether or not .... I mean that's a kind of a court issue as whether Richard Briscoe has anything to do with paying your [Statham's] fee. If he does, then, as a[n] officer of the court you so state, I mean that resolves the problem.

The judge repeated this skepticism later in the hearing, stating, "I'm also familiar with the fact that [a] lot of people in drug conspiracies and crimes do a lot of bragging in the community about who they bought or who they haven't bought and so forth."

Statham replied to the government's allegations, stating, "I'm offended by this personally and professionally." He also asserted that he had no knowledge that his former client, Bones, had been implicated in this case. Judge Burnett asked Statham if his position was that Bones was not paying his fee, stating, "I take it at this point ... that Richard Briscoe has nothing to do with paying your fee, period." To this, Statham responded, "That is exactly my—my position."[9]

---

**8.** The government submitted to Judge Burnett, *ex parte,* a transcript of a telephone conversation between Bones and an F.B.I. informant for inspection *in camera.* In that conversation, Bones and the F.B.I. informant discussed "that dude" from "Pennsylvania Avenue." Bones claimed that this was his man, who "[p]icked the lock," and walked right out of the police station. Bones then claimed that he had to pay an attorney about

$30,000 to defend this man. Bones claimed that he paid Mike Statham $10,000, and that he owed Statham another $15,000. The transcript was apparently furnished to Statham after the hearing, but before a July, 1996, hearing held before Judge Kramer.

**9.** At one point relatively late in the hearing on December 4, 1995, Mr. Statham made the puzzling statement that there was no doubt

Much of the discussion concerning the alleged conflict of interest occurred at a bench conference, away from Veney, who was still seated at the defendant's table. Once Statham had denied that Bones was paying his fee, Judge Burnett called Veney to the bench to ask him about the allegations:

The Court: Without going into the issues of who is paying Mr. Stat[ha]m's fee at this point for you, do you know the name of a Richard Briscoe?

Veney: Yes.

The Court: And with reference to no [sic] knowing Richard Briscoe, do you have any reason to believe that Mr. Richard Briscoe is paying Mr. Stat[ha]m to represent you?

At this point, there was apparently some confusion because another defendant named Tyrone Briscoe was pending trial before Judge Burnett in an unrelated matter. After Veney appeared to understand that the judge was inquiring about Bones, the colloquy continued:

The Court: Okay. Do you have any reason at this point to have any question in your mind about that individual paying Mr. Stat[ha]m's fee to represent you in this case?

Veney: None at all.

The Court: And the fact that Mr. Stat[ha]m may have represented Mr. Briscoe in a gun case or some other case in Maryland some time in the past—

Veney:—Uh-huh.

The Court:—do you think that presents any question of his loyalty to represent you?

Veney: None at all.

The Court: All right. And at this point you're content to have Mr. Stat[ha]m continue to represent you?

Veney: Yes, sir.

Judge Burnett issued an order denying the government's motion on December 21, 1995. In this order, the judge stated, "Counsel denied that any person named Richard Briscoe was paying his retainer fee in this case or that anyone else was paying his fee that would cause a conflict in representing the defendant in this case." The judge further noted "that individuals in the community on the street may frequently make unsubstantiated assertions and flip comments without any factual basis."

The conflict issue next surfaced before trial in July 1996, after the case had been transferred to Judge Noel Kramer. The government sought the admission of the tape of the telephone conversation between Bones and the F.B.I. informant, contending that the tapes were of a conversation in furtherance of a conspiracy. Statham objected.

During a colloquy concerning the admission of the tape, Judge Kramer stated, "Mr. Statham is saying I wasn't hired ... by Richard Briscoe." Statham replied, "By Richard Briscoe. Absolutely, your Honor." Later, Judge Kramer stated that it was reasonably clear from Judge Burnett's order that he found that there was not a sufficient basis to find that Statham had been paid by Bones. Judge Kramer eventually held that the telephone conversation was not in furtherance of a conspiracy, and excluded it from evidence pursuant to the hearsay rule.

At the conclusion of the trial, the jury found Veney guilty of second-degree murder while armed for the killing of Sean Nelson, first-degree murder while armed for the killing of Eric Briscoe, possession of a firearm during a crime of violence, carrying a pistol without a license, and

that neither he nor his client "know who Richard Briscoe is." This, however, must have been some kind of a rhetorical exercise because Statham had previously been informed by government counsel orally and in the motion to disqualify that Richard Briscoe

was Bones, and Statham had already acknowledged in his written opposition that he had represented Richard Briscoe in one case in Maryland in 1993 and in subsequent matters, and had acknowledged during the hearing that Richard Briscoe had been his client.

**1192**

escape. After sentencing Veney to substantial sentences for the other offense, some consecutive and others concurrent, the trial court sentenced Veney to twenty months to five years for escape. In doing so, the trial judge stated, "And the escape is of course consecutive."

Veney's timely direct appeal is the only matter before us. He did not file a motion for relief under D.C.Code § 23–110 (1996 Repl.) or mount any other collateral attack. Veney has not submitted any testimony or affidavit in which he states that Bones paid attorney Statham for defending Veney. In his brief on appeal, Veney states:

> Appellate counsel is *not* requesting a § 23–110 hearing, partly because she does not think Statham would be any more candid at such a hearing. Statham allowed appellate counsel access to Veney's trial files but did not produce any relevant billing records, despite express requests. A remand hearing would merely cause additional delay. The record on direct appeal is sufficiently complete for this Court to hold that Statham had an actual conflict which adversely affected his performance in Veney's defense.

(Emphasis in original). As Veney has chosen not to pursue such a hearing or any collateral attack, attorney Statham has not had an opportunity since trial to deny again or otherwise respond to the allegations regarding the payment of his fee.

## II.

Veney contends that he was denied his Sixth Amendment right to counsel because Statham's representation was adversely affected by a conflict of interest. Veney asserts that this conflict arose not simply from one factor, but from a combination of factors showing a relationship between Bones and Statham. In essence, Veney asserts that Bones paid Statham to represent Veney, that Statham had previously represented Bones, and that Bones was alleged to be a co-conspirator in this case.

Veney argues that these factors created a conflict that repeatedly affected Statham's judgment and caused Statham to pursue a strategy to protect Bones at Veney's expense.

"In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an *actual conflict of interest adversely affected his lawyer's performance.*" *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (emphasis added). The Supreme Court has also stated, "We have never held that the possibility of prejudice that 'inheres in almost every instance of multiple representation' justifies the adoption of an inflexible rule that would presume prejudice in all cases." *Burger v. Kemp*, 483 U.S. 776, 783, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (citing *Cuyler, supra,* 446 U.S. at 348, 100 S.Ct. 1708). Accordingly, "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler, supra,* 446 U.S. at 350, 100 S.Ct. 1708 (citing *Glasser v. United States*, 315 U.S. 60, 72–75, 62 S.Ct. 457, 86 L.Ed. 680 (1942)).

### A.

An actual conflict of interest exists when a defense attorney is "required to make choices advancing [another client's] interest to the detriment of his [current] client's interest." *United States v. Gantt*, 329 U.S.App. D.C. 287, 292, 140 F.3d 249, 254 (quoting *United States v. Bruce*, 319 U.S.App. D.C. 245, 252, 89 F.3d 886, 893 (1996)), *cert. denied,* —— U.S. ——, 119 S.Ct. 361, 142 L.Ed.2d 298 (1998). *See also Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir.1993) ("An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and the defendant's interests 'diverge with respect to a material factual or legal issue or to a

course of action.' ") (quoting *Cuyler, supra,* 446 U.S. at 356 n. 3, 100 S.Ct. 1708 (Marshall, J., concurring in part and dissenting in part), *cert. denied,* 511 U.S. 1022, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994)). Where a defendant has shown "that a conflict of interest actually affected the adequacy of his representation," the defendant "need not demonstrate prejudice in order to obtain relief ." *Cuyler, supra,* 446 U.S. at 349–50, 100 S.Ct. 1708 (citing *Holloway v. Arkansas,* 435 U.S. 475, 487–91, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)); *Thomas v. United States,* 685 A.2d 745, 751 (D.C. 1996).[10]

■ The situation is different where a defendant has shown only a *potential* conflict of interest, or the *possibility* of a conflict is apparent. If this possibility becomes apparent while the case is before the trial court, the court must inquire into whether an actual conflict exists. *See, e.g., Wood v. Georgia,* 450 U.S. 261, 273–74, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); *Cuyler, supra,* 446 U.S. at 350, 100 S.Ct. 1708; *Thomas, supra,* 685 A.2d at 751 (citing *Witherspoon v. United States,* 557 A.2d 587, 590 (D.C.1989)). The trial court's determination of whether a conflict of interest exists "presents a mixed question of law and fact." *Derrington v. United States,* 681 A.2d 1125, 1132 (D.C.1996) (quoting *Byrd v. United States,* 614 A.2d 25, 30 (D.C.1992)). The standard of review applied by this court is "a deferential one." *Id.* (citing *Bowman v. United States,* 652 A.2d 64, 73 (D.C.1994)). This court accepts the trial court's findings of fact unless they lack evidentiary support, and re-

views the legal issues *de novo. Id.* (citing *Byrd, supra,* 614 A.2d at 30).

■ "Conflicts of interest can arise both in cases of simultaneous and successive representation." *Mannhalt v. Reed,* 847 F.2d 576, 580 (9th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988). Representing more than one person charged in the same criminal transaction, however, does not automatically create a conflict of interest. *See Burger, supra,* 483 U.S. at 783–84, 107 S.Ct. 3114; *Cuyler, supra,* 446 U.S. at 348–50, 100 S.Ct. 1708. Indeed, "[a] common defense often gives strength against a common attack." *Holloway, supra,* 435 U.S. at 482–83, 98 S.Ct. 1173 (quoting *Glasser v. United States,* 315 U.S. 60, 92, 62 S.Ct. 457, 86 L.Ed. 680 (Frankfurter, J., dissenting)).

■ "Generally, it is more difficult to show an actual conflict resulting from successive rather than simultaneous representation." *Mannhalt, supra,* 847 F.2d at 580 (citations omitted). An actual conflict in successive representation may arise where the subject matter of the previous representation is substantially related to the case being tried, the attorney reveals privileged communications of the former client stemming from the previous representation, or the attorney's loyalties are otherwise divided. *Id. See also Smith v. White,* 815 F.2d 1401, 1405–06 (11th Cir.), *cert. denied,* 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987).

In one case of successive representation, however, we remanded for a new trial

---

10. In such a situation, we do not apply the familiar test of *Strickland v. Washington,* 466 U.S. 668, 689, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to determine whether counsel's performance was deficient. Rather, as pointed out in *Thomas, supra,* 685 A.2d at 751, we apply a different standard when an actual conflict of interest has been shown. As the United States Court of Appeals for the Third Circuit had pointed out, to prove deficient performance the defendant is required first to:

> demonstrate that some plausible alternative defense strategy or tactic might have been

pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

*United States v. Gambino,* 864 F.2d 1064, 1070 (3d Cir.1988) (lead opinion), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 566 (1989).

where the defense counsel had cross-examined the complaining witness who then asserted that the defense counsel: (1) had previously represented that witness; (2) was privy to confidential information due to the prior representation; and (3) used that confidential information in the cross-examination. *Singley v. United States,* 548 A.2d 780, 784–86 (D.C.1988). The trial court, assuming, without inquiring, that a conflict existed, brought about an adverse effect when it instructed the jury to disregard counsel's cross-examination of the complaining witness, which had been damaging to the prosecution. *See id.* at 786. We remanded the case for a new trial because "[w]hat transpired was the equivalent of what would have happened if a trial counsel, burdened with an actual conflict of interest, had foregone certain actions in defense of his client because of the conflict." *Id.* In a case involving simultaneous representation, we held that a conflict of interest existed where an attorney represented a defendant who had information that could be used against another client in an unrelated ongoing criminal matter and might plausibly be useful as a "bargaining chip" for defendant but the lawyer did not make such an offer to the government. *Derrington, supra,* 681 A.2d at 1136.

 In this instance, Veney has not alleged that Statham represented both him and Bones simultaneously. This is not a situation where the attorney represented two persons charged in the same criminal transaction. Bones was not a defendant at Veney's trial. Rather, Statham had previously represented Bones in unrelated criminal charges in Maryland.[11]

There is no indication that Statham was ever in a position to use confidential information obtained from Bones in Veney's defense. Statham stated that he had been unaware of Bones' suspected involvement in the murders of Nelson and Briscoe before the government moved to have him

removed as counsel for Veney. Moreover, Bones was not called as a witness, and thus Statham faced no decision over whether he could use previously acquired confidential information to cross-examine him. In short, Veney has not identified any actual conflict of interest that arose from Statham's previous representation of Bones.

**B.**

The allegation that Bones paid Statham's fee for representing Veney presents a second possible basis for a conflict of interest on Statham's part. The Supreme Court recognized that having third parties pay for the representation of a criminal defendant has the potential for creating a conflict of interest:

> Courts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise. One risk is that the lawyer will prevent his client from obtaining leniency by preventing the client from offering testimony against his former employer or from taking other actions contrary to the employer's interest.

*Wood, supra,* 450 U.S. at 268–69, 101 S.Ct. 1097 (footnotes omitted). In *Wood,* two adult bookstore employees were charged with distributing obscene material. The bookstore owner paid for a lawyer to represent the defendants, his employees. The *potential* for conflict was apparent, and led the prosecutor to raise the issue before the trial court. *Id.* at 272–73, 101 S.Ct. 1097. The Supreme Court, however, did not conclude that a conflict existed, but that one was strongly suggested, and remanded the case to the trial court for a hearing on whether an actual conflict of interest existed. *Id.* at 273–74, 101 S.Ct. 1097.

---

**11.** Veney's appellate counsel proffers that Statham also represented Bones in a D.C.

Superior Court case that was dismissed shortly before Statham began to represent Veney.

*Wood* presented a situation somewhat similar to the one alleged in this case. Veney now alleges that Bones took the lead in the murders. Thus, the argument goes, if Bones had paid Statham to defend Veney, Statham would have had divided loyalty. In essence, Veney contends that Statham pursued a trial strategy that was calculated to protect Bones at Veney's expense because Bones paid for Veney's defense.

For Veney to prevail on his allegation, there must first be a finding of fact that Bones did indeed pay Statham's fee. This issue was brought to the attention of the trial court by the government when it filed its motion to disqualify Statham.

██ Judge Burnett held a hearing on the motion before which he read the above-quoted transcript of the telephone conversation between Bones and the F.B.I. informant. He heard Statham's in-court denial that Bones had paid his fee. He also had before him Statham's opposition to the government's motion in which he "vehemently denied" that Bones paid his fee. In addressing the issue of a potential conflict of interest, the trial court may give weight to counsel's representations concerning the alleged conflict. *See United States v. Haren,* 952 F.2d 190, 195 (8th Cir.1991); *United States v. Crespo de Llano,* 838 F.2d 1006, 1012–13 (9th Cir.1987).

Having reviewed the transcripts of the various proceedings, we agree with Judge Kramer's assessment that Judge Burnett did indeed make a finding that Bones was not paying Statham's fee for representing Veney. While he did not make a formal finding, the clear purport of Judge Burnett's language when he denied the government's motion to disqualify Statham was that he accepted Statham's denial and was unpersuaded by the statement attributed to Bones by an F.B.I. informant to the effect that Bones was paying for Veney's representation. We also note that when Judge Kramer later asked Statham about the matter, Statham answered that it was "[a]bsolutely" his position that Bones was not paying his fee.

██ We will set aside a factual finding of the trial court only when it is plainly wrong or without evidence to support it. D.C.Code § 17–305(a) (1997 Repl.); *In re A.S.,* 614 A.2d 534, 536–37 (D.C.1992). In light of Statham's disavowal and the less than compelling showing to the contrary, we will not disturb Judge Burnett's finding. We hold, however, that Veney would not succeed on this point in any event because, as we will next explain, he cannot show that any alleged conflict adversely affected Statham's performance.[12]

12. The right to counsel free of conflict may be waived. *Holloway, supra,* 435 U.S. at 483 n. 5, 98 S.Ct. 1173; *Douglas v. United States,* 488 A.2d 121, 137 (D.C.1985); *Lollar v. United States,* 126 U.S.App. D.C. 200, 201–03, 376 F.2d 243, 244–46 (1967). A waiver can only be made after full disclose of the conflict. *Douglas, supra,* 488 A.2d at 137–38 (citing Model Code of Professional Responsibility DR 5–101(a) (1981); D.C.App. R. X (1978)). The waiver must be made knowingly and intelligently. *Id.* Further, the record must reflect that the defendant "knows what he is doing and his choice is made with eyes open." *Id.* (quoting *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)). Accordingly, the trial court must take steps to ensure the waiver is sufficient:

> [B]efore a waiver is accepted the trial court should conduct, on the record, an inquiry sufficient to establish that the defendant is

aware of the right to conflict-free representation; understands the nature of the risks and the potential adverse effects of foregoing that right; and knows that, if convicted, he or she will not be able to complain on appeal that the defense at trial was compromised by the conflict.

*Id.* at 138 (citing *Lollar, supra,* 126 U.S.App. D.C. at 202–03, 376 F.2d 243; *United States v. Curcio,* 680 F.2d 881, 888–90 (2d Cir.1982)). The defendant must be free to consult with an independent attorney before making a waiver. *Fitzgerald v. United States,* 530 A.2d 1129, 1135 (D.C.1987).

The government does not argue waiver, and candidly admitted in oral argument that a waiver argument would be weak. In this instance, the judge conducted the hearing outside the presence of Veney except for a short time while Veney was at the bench. At that time the judge did not actually tell Veney

## C.

■ Even though we conclude that Veney has not established an actual conflict of interest, we will address the second prong of the *Cuyler* test, *viz.*, whether an alleged conflict actually affected the attorney's performance. 446 U.S. at 348, 100 S.Ct. 1708; *Derrington, supra,* 681 A.2d at 1136.[13] A conflict actually affects the attorney's performance where, for example, a strategy is foreclosed to the defendant because it would hinder the attorney's representation of his or her other client. *See Fitzgerald v. United States,* 530 A.2d 1129, 1138–39 (D.C.1987).

■ Veney contends Statham's performance was actually affected by a conflict in several ways. First, Veney contends, Statham failed to pursue a plea bargain. Veney now argues that he could have cooperated with the government in its case against Bones in exchange for some plea arrangement. We find this contention unavailing.

The record shows that some plea bargain negotiations did occur and discloses the reasons a plea bargain was never reached. First, according to representations made by the government in its November 1995 motion, a plea bargain had been proposed. The Assistant U.S. Attorney mentioned to Statham his belief that a second person was involved in the murder, and indicated a possible plea bargain. Statham stated that he presented the idea of a plea bargain to Veney, who took no further action. Thus, it appears from the record on appeal that it was Veney who did not follow through with regard to a plea bargain.[14]

Statham stated that a second reason for the failure of plea negotiations was that he was concerned over collateral litigation concerning the terms of any oral plea offer. Statham represented to the trial court that no plea bargain had ever been offered prior to the November 1995 motion. After reading the government's representation in its November 1995 motion that a plea bargain had been offered, Statham requested a written offer to present to his client. According to Statham's un-

---

the basis for the government's assertion that Bones was paying his legal fee. Nor does it appear that Veney was informed that a waiver of this right would have foreclosed an appeal on the issue. In sum, the court's inquiry was not sufficient to establish Veney's waiver of any conflict of interest.

Although the trial court must be careful not to intrude unduly in the attorney-client relationship, if the trial court is advised of information that could affect the relationship, it is prudent practice to pass the information to the defendant so that he can decide whether it affects his view of the adequacy of his representation by counsel. Here, the government made an *ex parte* submission of a transcript of the conversation between Bones and the informant. Thus, neither defense counsel nor the defendant was in a position to consider or comment prior to Judge Burnett's ruling about the statements attributed to Bones. While this withholding of information, apparently tactical, may have hampered the inquiry, the government's alternative suggestion of appointment of different defense counsel to consult with Veney about the alleged conflict was constructive. If it had been offered by the court, and accepted by Veney, the conflict issue might well have been resolved.

**13.** This additional step is appropriate for the same reason that in practice appellate courts sometimes merge the two conceptually separate prongs of *Cuyler. See, e.g., Fitzgerald v. United States,* 530 A.2d 1129, 1138 (D.C.1987) ("Actual conflict will not be found, however, unless appellant can point to specific instances in the record to suggest an actual conflict or impairment of their interests.") (quoting *United States v. Mers,* 701 F.2d 1321, 1328 (11th Cir.), *cert. denied sub nom., Ferrante v. United States,* 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983)) (internal quotation marks omitted). There may well be instances where the actions of counsel demonstrate the existence of a conflict of interest that is otherwise difficult to prove.

**14.** As we stated earlier, Veney's appellate counsel chose not to develop the record further in a § 23–110 proceeding. Such a proceeding could have provided, among other things, Veney's version of whether Statham informed him of the government's plea offer, and whether it was Veney who, in fact, did not follow through on this offer.

rebutted representations, the government never produced one. Thus, we are not persuaded that the fact that there was not more extensive plea bargaining demonstrates that Statham's representation of Veney was actually affected by a conflict of interest.

■ Next, Veney contends that Statham's performance was actually affected by the conflict of interest in that Statham failed to pursue a "blame-shifting" strategy. That is, Veney argues that Statham should have attempted to show that it was Bones and some unidentified third party dressed entirely in black clothing who shot Nelson and Briscoe, and that his failure to do so resulted from his loyalty to Bones.

■ Where an attorney cannot engage in a strategy of "blame-shifting" because of a conflict his performance may be considered to be adversely affected. *Fitzgerald, supra*, 530 A.2d at 1139. A strategy of "blame-shifting," however, "must have been an option realistically available to trial counsel," *Mers, supra* note 13, 701 F.2d at 1331, before foregoing it can be viewed as an adverse effect. The appellant must show more than "some attenuated hypothesis having little consequence to the adequacy of the representation." *Brien v. United States*, 695 F.2d 10, 15 (1st Cir.1982) (citation omitted). It has been held that even the fact that a trial tactic benefitted another client or former client does not itself reveal that a conflict of interest actually affected the attorney's performance:

> [T]here is no conflict of interest adversely affecting the attorney's performance if an attorney at trial does not raise a defense on behalf of his client because to do so is not in that client's interest even though it is also in the interest of another client that it not be raised.

*Gambino, supra* note 10, 864 F.2d at 1071 (lead opinion).

■ The trial attorney's performance is not adversely affected where the best interest of the client "could have dictated precisely the course suggested" by the trial attorney. *Carey v. United States*, 50 F.3d 1097, 1100 (1st Cir.1995). Such a situation occurs when a trial attorney rejects a strategy as being "specious" or because it could negatively affect "the credibility of appellant's entire case." *Gambino, supra* note 10, 864 F.2d at 1072 (lead opinion).

We are far from persuaded by Veney's contention that Statham should have pursued a "blame-shifting" strategy. Even if Veney had attempted to shift the blame for the killings to Bones, Veney could not easily have escaped his connections to Bones. On the witness stand, Veney admitted that he and Bones were friends. Veney also admitted that he was upset over the death of Strohman, the event supposedly avenged by the murders of which Veney was convicted.

The government presented strong evidence of a connection between Bones and Veney regarding the murders in question. The government showed that many telephone calls were made from Bones' cellular phone either to Veney's home, or to his pager. There was a total of about ninety-five such calls. While it was not made clear when all those calls were made, the phone records did showed clearly that Bones made calls to both Veney and Nelson just prior to the murders. Thus, if Statham argued Bones had masterminded this murder, he could not escape this evidence connecting Veney to Bones. Because of the connection, if Statham had pursued a strategy that highlighted Bones' involvement in the murders, that would have drawn Veney further into the chain of inferences created by the government tending to show that Veney conspired with Bones to kill Nelson. In light of the foregoing, we cannot say that pursuing a "blame-shifting" strategy would have been in Veney's best interest.

■ As another indication of how Statham's performance was affected by the alleged conflict of interest, Veney points to

Statham's closing argument. Specifically, Veney contends Statham began his closing argument with a defense of Bones, Statham's former client. We cannot agree with this interpretation of the record. The government had presented evidence connecting Veney to Bones. The government had also argued that Bones was involved in the murders. Statham, therefore, had to address Bones' involvement in the murders in his closing argument to be persuasive to the jury. Essentially, Statham's closing argument was an attempt to show the weaknesses of the government's case.

Consistent with his position regarding a "blame-shifting" strategy, Veney contends Statham should have emphasized the fact that on the night of the killings, Officer Isom identified the shooter as wearing all black, when Veney in fact wore a blue sweatshirt, blue jeans, and tan boots. Similarly, Officer Coleman identified the shooter as wearing dark clothing. On appeal, Veney's theory is that he was a victim of a misidentification, and that the real shooter wore all black.

An examination of the record, however, reveals that Statham did pursue a theory that Veney was misidentified by the witnesses. In his closing statement, Statham drew the jury's attention to the discrepancy between the description of the clothing given by Offices Isom and Coleman on the night of the killings, and what Veney actually wore.

▪ Veney also contends that Statham's cross-examination of government witnesses was influenced by his alleged loyalty to Bones. Our reading of the record, however, shows that Statham conducted effective cross-examination under the circumstances. He highlighted discrepancies between the officer's identifications and their grand jury testimony. He emphasized the confusing circumstances surrounding the shootings and called attention to language from police reports and grand jury testimony that appeared to indicate that there was only one shooter. This does not appear to have been an effort to protect Bones, but rather an attempt to discredit the government witnesses before the jury. In all, the cross-examination of the government witnesses does not suggest that Statham's performance was actually affected by the alleged conflict.

▪ Finally, Veney contends Statham was hampered in his defense of Veney because his loyalty to Bones prevented him from calling Bones as a witness. Bones, however, was a target of a government investigation, and suspected of being involved in this crime. Although Bones himself had not been indicted, he had a Fifth Amendment privilege that he would surely have invoked. Thus, there was no realistic chance that, if called, Bones would have testified about the murders. Undercutting this argument and all related arguments to the effect that Statham conducted Veney's defense in a manner calculated to protect Bones is the fact that the government was already well aware of the evidence that Bones was a principal in the murders, and brought that out at trial. Little or no harm could have been done to Bones by any reference to him by the defense. Considering all of Veney's arguments, we conclude that he has failed to show that any conflict of interest actually affected Statham's performance.

### III.

Veney argues that he should be resentenced for escape because the trial judge erroneously believed that a consecutive sentence was mandatory. The government argues that Veney did not object at trial, and that appellant has not shown plain error.

▪ To warrant relief on plain error review, the error must be clear and obvious. *See United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Additionally, the error should cause reversal only where the error is "so clearly prejudicial to substantial rights as

to jeopardize the very fairness of the trial." *(Linwood) Johnson v. United States,* 387 A.2d 1084, 1089 (D.C.1978) (en banc) (citing *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc); *Adams v. United States,* 302 A.2d 232, 234–35 (D.C. 1973); *Bunter v. United States,* 245 A.2d 839, 841–42 (D.C.1968)).

 The statute, D.C.Code § 22–2601(b) (1996 Repl.), states that a sentence for escape shall "begin, if the person is an escaped prisoner, upon the expiration of the original sentence." The government concedes that "a consecutive sentence is mandated only when the defendant was serving an 'original sentence,' " but nevertheless contends there was no plain error, because in common usage the term "prisoner" describes all persons taken into custody by police. This argument limps, however, because the imposition of the mandatory consecutive sentence requires two elements. Even if the term "prisoner" is read broadly to include all persons detained by the police, the statute still requires, as a second element, an original sentence. Veney had not been tried and convicted when he was in police custody, and therefore was not under an original sentence. Because Veney was not under an original sentence, or any sentence as far as the record shows, a consecutive sentence was not mandatory.

 There would be error if the trial judge failed to recognize that she had discretion over this matter. *See (James) Johnson v. United States,* 398 A.2d 354, 363 (D.C.1979). In this instance, the judge did not discuss the application of the escape statute on the record. She commented only that the sentence for escape would "of course [be] consecutive." Neither counsel commented on the imposition of this sentence during the hearing.

The use of the words "of course" make it appear that the trial judge believed that imposition of a consecutive sentence for escape was mandatory in this instance. The government does not argue otherwise.

This is by far the most plausible reading of this record, and indicates an error that is clear and obvious and meets the criteria for plain error in this discrete part of the proceeding. Thus we find plain error, and remand the case for resentencing for the conviction of escape. Upon remand, the trial court may, in its discretion, impose either a consecutive or concurrent sentence.

## IV.

Veney's convictions are hereby affirmed. Veney has not shown that his counsel possessed a conflict of interest that actually affected counsel's performance. The case must be remanded, however, for resentencing on the conviction for escape.

*Affirmed in part; remanded in part.*