*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

### Nos. 17-CO-243, 17-CO-244, & 17-CO-245

### ROBERT F. GAULDEN, APPELLANT,

### V.

### UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF2-19416-06, CF2-3217-08, CF2-20509-08)

(Hon. Robert E. Morin, Trial Judge)

(Argued May 7, 2019        Decided October 8, 2020)

*Jenifer Wicks* for appellant.

*Anne Y. Park*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Nicole Raspa*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, *Associate Judges*, and GREENE,[*] *Senior Judge*, *Superior Court of the District of Columbia*.

---

[*] Sitting by designation pursuant to D.C. Code § 11-707 (a) (2012 Repl.).

GLICKMAN, *Associate Judge*:  Appellant, Robert F. Gaulden, challenges the trial court's denial after a hearing of five claims of ineffective assistance of counsel.  Appellant raised these claims in a D.C. Code § 23-110 motion to set aside his convictions on a series of counts relating to his unlawful possession of a firearm and his efforts to obstruct justice by threatening witnesses.  For reasons set forth in the trial court's written decision, we reject appellant's challenges and affirm the denial of his motion.

**I.**

On June 22, 2006, police saw a man carrying a semiautomatic pistol with a long, extended high capacity magazine, emerge from a parked car and run into an apartment building.  One of the officers and two civilian eyewitnesses, Alesha and Felicia Knott, identified the fleeing man as appellant.  He was charged with unlawful possession of a firearm by a convicted felon and other weapons-related offenses.  His first trial on those charges, at which both Alesha Knott and Felicia Knott testified, ended in a mistrial in February 2008.

Alesha Knott's friend Cleveland Bryan accompanied her when she came to court for appellant's February trial.  The following month, according to Bryan, appellant spotted him when they were being transported together by bus from the

D.C. Jail to Superior Court on March 25, 2008, for hearings in their unrelated criminal cases. Bryan reported (and later testified) that appellant threatened to kill Alesha and Felicia Knott for testifying against him, and to kill Bryan for supporting Alesha Knott's decision to testify. On the bus ride back from the courthouse, Bryan said, appellant "tr[ied] to persuade [him] . . . to get [Alesha Knott] to . . . take her statement back" and say that the government had "paid her to lie." Appellant allegedly added that if Bryan did not succeed, appellant would make sure he encountered "problems" at the Jail. After returning to the Jail, Bryan placed a recorded call that evening to Alesha Knott and told her about appellant's threats. Bryan also reported appellant's threats to the government; they were the basis for the obstruction and threats charges at issue in this appeal.

The weapons and obstruction charges were joined for trial in May 2009. Alesha and Felisha Knott again testified that they saw appellant running from the police on June 22, 2006, as did one of the police officers who chased him and saw him holding a gun.[1] Appellant's defense to the weapons charges was that the eyewitnesses had wrongly identified him.

---

[1] Alesha Knott, who knew appellant, claimed not to remember the events of June 22, 2006. Her contrary grand jury testimony was introduced as substantive evidence.

Bryan testified to his March 25, 2008 encounter with appellant, and his recorded phone call to Alesha Knott of that evening was introduced in evidence. Appellant contended that Bryan was blowing their jail bus conversation out of proportion and that, while he and Bryan had spoken on the bus, appellant had not made any threats. Defense counsel opened on this theory, telling the jury that appellant "never tried to get anyone to say anything other than the truth." In support of that theory, counsel cross-examined Bryan on whether he had exaggerated and embellished appellant's words to lessen his own jail time.[2] In the defense case, appellant did not testify, but called a witness named James Brandon to support his version of the jail bus incident. The defense expected Brandon to testify, as he had before the grand jury, that he was on the bus and heard appellant and Bryan get into an argument, but did not hear appellant make any threats. Brandon surprised the defense, however, by testifying that he did not remember seeing Bryan on the jail bus. To salvage the situation, the defense entered into a stipulation with the government that Bryan had been on the bus along with Brandon and appellant.

---

[2] As part of a plea agreement in his own case, Bryan had agreed with the government to testify against appellant. The cross-examination of Bryan emphasized his strong desire to reduce his jail time because he was struggling to cope, as well as past lies Bryan had told and dramatic things he had said to Alesha Knott in recorded phone calls from the Jail.

The jury found appellant guilty of most of the charges emanating from the June 22, 2006, and March 25, 2008 incidents. This court affirmed appellant's convictions on direct appeal.

## II.

In his § 23-110 motion and this appeal from its denial, appellant claims his defense counsel was ineffective in the following five ways: (1) failing, due to a conflict of interest, to call a former client named Robert Pettus to provide testimony at trial that Bryan was *not* on the jail bus with appellant on March 25, 2008; (2) stipulating to Bryan's presence on that bus; (3) failing to obtain a surveillance camera recording of what happened on the jail bus, or to request that the government be sanctioned for destroying that recording; (4) failing to inform appellant of the details of the government's plea offer and giving him false hope he would be acquitted based on evidence counsel did not intend to present; and (5) failing to present evidence of appellant's physical inability to run like the man seen fleeing with a gun by the prosecution's witnesses on June 22, 2006.

In order to succeed under the two-part test for evaluating ineffective assistance of counsel claims set forth in *Strickland v. Washington*,[3] an appellant must show both "that his or her trial counsel's performance was deficient under prevailing professional norms, and that the deficient performance prejudiced his or her defense."[4] Because "[f]ailure to satisfy either prong" of the *Strickland* test "defeats the [ineffective assistance of counsel] claim," the court may address the prejudice prong first and is not required to address deficiency if the appellant fails to show prejudice.[5]

The inquiries for each prong of *Strickland* involve mixed questions of law and fact.[6] "[W]e accept the trial court's findings of fact unless they lack evidentiary support in the record," and "[w]e review the trial court's legal determinations *de novo*."[7] We defer to a judge's reasonable "credibility

---

[3] 466 U.S. 668 (1984).

[4] *Long v. United States*, 910 A.2d 298, 309 (D.C. 2006); *see Strickland*, 466 U.S. at 687-88.

[5] *Smith v. United States*, 203 A.3d 790, 796 (D.C. 2019).

[6] *Cosio v. United States*, 927 A.2d 1106, 1123 (D.C. 2007) (en banc).

[7] *Id.*

determinations" because such determinations are "the appropriate function of the fact finder."[8]

"A criminal defendant . . . can also establish ineffective assistance of counsel by showing that defense counsel had an actual conflict of interest."[9] Where an appellant failed to object to the alleged conflict at trial, he "must demonstrate that an *actual conflict of interest adversely affected his lawyer's performance*."[10] Conflicts that "are merely speculative or hypothetical" are not *actual* conflicts.[11] To prevail on an ineffectiveness claim based on a conflict of interest, appellant must demonstrate "(1) that 'some plausible alternative defense strategy or tactic might have been pursued' but was not, and (2) that the alternative defense was 'inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'"[12]  "'An alleged conflict of interest that obstructs the use of a

---

[8] *Ruffin v. United States*, 25 A.3d 1, 8 (D.C. 2011) (internal quotation marks omitted) (quoting *Price v. United States*, 985 A.2d 434, 439 n.5 (D.C. 2009)).

[9] *Wages v. United States*, 952 A.2d 952, 960 (D.C. 2008).

[10] *Veney v. United States*, 738 A.2d 1185, 1192 (D.C. 1999) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)).

[11] *Gibson v. United States*, 632 A.2d 1155, 1159 (D.C. 1993).

[12] *McCraney v. United States*, 983 A.2d 1041, 1060-61 & n.64 (D.C. 2009) (quoting *Veney*, 738 A.2d at 1193 n.10).

particular strategy or defense is not significant unless the defense is plausible,' meaning it was available and realistically 'might have influenced twelve reasonable jurors.'"[13]

### A. Failure to Interview Robert Pettus and Call Him as a Witness

Appellant's trial counsel, Public Defender Service attorney Eric Klein, had represented Pettus briefly in connection with an unrelated criminal proceeding. Klein withdrew from that representation in December 2007, over a year before appellant's trial. Other PDS attorneys continued to represent Pettus until July 2008, some ten months before appellant's trial.

Appellant argues that a conflict of interest arising from Klein's prior representation of Pettus caused him to refrain from interviewing Pettus and calling him as a witness at appellant's trial. Appellant reasons that Klein had an actual conflict because he "must have known that if Mr. Pettus were to testify at trial in a manner that did not advance [appellant's] case, it would have been incumbent on Mr. Klein to cross-examine Mr. Pettus and to potentially attack his veracity[,] . . .

---

[13] *Id.* at 1060 & n.63 (quoting *Fitzgerald v. United States*, 530 A.2d 1129, 1138 (D.C.1987)).

[which] undoubtedly would have involved using confidential and/or privileged information that Mr. Klein learned about Mr. Pettus during PDS'[s] representation of Mr. Pettus."[14]

This scenario is purely hypothetical and conclusory; there is no evidence that it actually motivated Klein,[15] or that Klein acquired any confidential or privileged information that could have been used to impeach Pettus. Absent such evidence, the imagined scenario does not satisfy the standard for an actual conflict. Normally, as we held in *Freeman v. United States*,[16] when an alleged conflict stems merely from the fact that a defendant's attorney previously represented a favorable defense witness in an entirely unrelated case, "there [i]s no risk that [the attorney] w[ould] [be] in a position to act detrimentally to either of his clients' interests" because "the interests of [the defendant and the witness] [a]re not in conflict nor d[o] they risk dividing their shared attorney's loyalties."[17]

---

[14] Brief for Appellant at 20-21.

[15] On its face, the imagined explanation is attenuated and even far-fetched, since Klein would have called Pettus as a witness at trial only if he expected he would not have to impeach Pettus's testimony.

[16] 971 A.2d 188 (D.C. 2009).

[17] *Id.* at 203-04.

In fact, the trial court found, based on the testimony at the § 23-110 hearing, that "Mr. Klein's prior representation of Mr. Pettus did not play a role in his decision not to interview or call him as a witness." Appellant has not demonstrated that this finding is clearly erroneous. The record shows that Klein had other sound reasons to forgo Pettus as a witness; Klein testified that, while he could not recall all his reasons after so many years, Pettus's convictions for first-degree murder and other felonies in a recent "high profile case" factored into the decision. Where an attorney would have made the same decision even if he had not previously represented another individual, "[t]he trial attorney's performance is not adversely affected" by the prior representation.[18]

The trial court further found that appellant had neither identified "a plausible defense strategy" Klein failed to pursue because of his putative conflict of interest, nor demonstrated that Pettus "actually possessed relevant, exculpatory testimony" that could have made any difference at appellant's trial so as to establish *Strickland* prejudice. The evidence adduced at the § 23-110 hearing supported these findings and conclusions. As more fully explicated in the trial court's written decision, Pettus could not credibly testify that he actually was on the jail bus with appellant

---

[18] *Veney*, 738 A.2d at 1197.

on March 25, 2008; he admitted it "could have been another day in March" that he and appellant were on the bus. In addition, Pettus's credibility was heavily impeached by his prior criminal convictions and his past claims to have been suffering from severe mental illnesses, delusions, and memory problems.[19] We see no reason to question the trial court's assessments, which also took into account Pettus's demeanor on the witness stand, that Pettus's proffered testimony denying Bryan's presence on the March 25, 2008 jail bus "would not have been persuasive because he was not believable as a witness and some of his testimony was manifestly incredible," and that "Pettus offered no exculpatory value while also raising credibility issues." Given, too, that the contemporaneous recording of

---

[19]  On cross-examination, Pettus testified that he began having "memory problems" in 2004 after hitting his head in a car accident. He asserted that, by 2008, his memory was "[f]air." In further testimony, however, he acknowledged having claimed severe mental impairments on many occasions. Pettus had claimed to be "delusional" and temporarily "insane" at the time of one of his past crimes in order, he said, to "advance [his] insanity theory." He had testified in a previous proceeding that he was "mentally ill," "that [he] had not been treated adequately for [his] mental health," and that he did not become "competent" until 2009. Pettus also acknowledged having testified that he thought "something [wa]s wrong with [his] brain." He brushed this off as something he had said "to advance [his] theory that [his] whole head was mess[ed] up, [and he] was neglected." Pettus similarly admitted to "throw[ing]" self-diagnosed labels of post-traumatic stress disorder and paranoid schizophrenia "out there" in a proceeding for his own criminal case in the hopes of "get[ting] the judge to understand where [he] was coming from." He also stated that he had been diagnosed with bipolar disorder and had never been treated for it.

Bryan's March 25, 2008 phone conversation with Alesha Knott strongly corroborated Bryan's claimed presence on the jail bus with appellant that day, we agree that Pettus would not have supported a plausible alternative defense strategy for appellant, and that appellant has not shown a reasonable probability that Pettus's testimony would have altered the outcome of the trial.

## B. Stipulation that Bryan was on the Bus with Appellant

At trial, after Brandon unexpectedly testified that he did not recall seeing Bryan on the bus on March 25, 2008, Klein sought to salvage the situation by stipulating as follows:

> On March 25th, 2008, a witness James Brandon appeared for a Court hearing at the DC Superior Court. . . . [H]e was transported on the bus from DC Jail with the Defendant Robert Gaulden and the witness Cleveland Br[y]an.

Appellant contends that his counsel performed deficiently in making this stipulation because it prevented the defense from using Brandon's testimony to contest Bryan's presence on the jail bus. The trial court rejected this contention,

concluding instead that Klein's decision to enter into the stipulation was reasonable under the circumstances. We agree.[20]

As the trial court found, crediting Klein's testimony, the defense pursued a reasonable strategy at trial of trying "to discredit Mr. Bryan's testimony about what actually occurred on the bus rather than deny that [appellant and Mr. Bryan] were on the bus together."[21] Defense counsel opened on that theory and cross-examined Bryan in accordance with it. This may well have been the only reasonable strategy to pursue, given the strong corroboration of Bryan's presence on the bus. Brandon's expected testimony would have supported that strategy. His unexpected testimony at trial undercut it and diminished the credibility and exculpatory value of Brandon's own testimony. Thus, as the trial court concluded, "counsel's reasonable decision was that the stipulation could (1) help rehabilitate Mr. Brandon's testimony and (2) establish that he was on the bus with Mr. Bryan and Mr. Gaulden and thus would have seen any interaction between the two." In

---

[20] The court also concluded there was no reasonable probability that, but for the stipulation, appellant would not have been convicted of the charges of threats and obstruction based on Bryan's testimony. We agree with that conclusion as well.

[21] The court credited Klein's testimony that his pretrial investigation had confirmed that the jail bus passengers on March 25, 2008, included appellant, Bryan, Brandon, and Pettus.

addition to reconciling Brandon's testimony with the defense theory that appellant and Bryan had a conversation, but that appellant did not make any threats, the stipulation made room for the jury to draw the positive inference (if it found Brandon credible) that because Brandon did not remember Bryan's presence, any conversation between appellant and Bryan must have been mild and unremarkable. Without the stipulation, the jury would likely have discounted Brandon's testimony as wrong, because it deviated from both the government's evidence and the defense's theory of the case.

"An appellate court will not second-guess trial counsel's strategic choices,"[22] particularly where, "in the circumstances presented, and considering the alternatives, it was a reasonable strategy, and it was selected . . . on the basis of sufficient pretrial investigation."[23] Here, trial counsel's stipulation was a reasonable strategic choice, albeit forced by less than ideal circumstances. It was therefore not deficient performance.[24]

---

[22] *Brown v. United States*, 934 A.2d 930, 943 (D.C. 2007).

[23] *Leftridge v. United States*, 780 A.2d 266, 273 (D.C. 2001).

[24] The trial court also rejected appellant's assertion that Klein coerced him into agreeing to the stipulation in order to avoid angering the trial judge. As the court observed, the stipulation "was read in open court and Mr. Gaulden, who was active in his defense and not shy about informing the Court of his discontent

*(continued…)*

## C. Failure to Obtain Surveillance Camera Footage or Request Sanctions for Premature Destruction of Evidence

Appellant argues that defense counsel was ineffective in failing to obtain surveillance footage recorded by a camera on the jail bus on March 25, 2008; and that, if this failure was due to the government's premature destruction of the surveillance footage, counsel was ineffective in failing to request that the court sanction the government for the loss of the evidence. These arguments fail because the trial court, crediting the testimony presented by the government of a Supervisory Deputy U.S. Marshal and a Department of Corrections Captain, found that the alleged footage never existed because no camera surveillance was being conducted on any of the jail buses in March 2008. We see no reason to overrule that factual finding. It means that appellant cannot show deficient performance or prejudice based on counsel's alleged failure to obtain the footage or seek sanctions for its supposed loss.

---

*(...continued)*
during the trial, made no objection to the stipulation as it was presented at trial or at any time thereafter" (until the § 23-110 hearing). We see no reason to disagree with the court's finding that appellant entered into the stipulation "freely and voluntarily, and as a result of a strategic decision by the defense."

**D. Counseling Regarding Plea Offer**

Appellant's next claim of ineffectiveness is that his trial counsel's deficient performance caused him to reject the government's day-of-trial plea offer that could have resulted in a lighter sentence. The offer would have required appellant to plead guilty to one felony firearms possession offense, one count of obstruction as to Alesha Knott, one count of obstruction as to Felisha Knott, and one count of threats against Cleveland Bryan, in exchange for dismissal of the remaining charges. At the motion hearing, appellant asserted (with some inconsistency, as the trial court noted in its decision) that Klein (1) failed to explain the details of the plea offer to him, and (2) convinced him not to accept it by falsely promising to introduce evidence supporting his physical impairment and his jail bus surveillance footage claims. Appellant also continued at the hearing to assert his innocence of some of the charges the plea offer would have required him to admit.

For multiple reasons, the trial court found appellant's "testimony on the issue about the plea offer to be largely incredible and self-serving." Crediting Klein's "testimony and experience," and the inconsistencies in appellant's testimony, the court disbelieved appellant's allegations that Klein had failed to inform him of the details of the plea offer, and that Klein had falsely promised to

introduce favorable evidence he did not have or expect to have. Moreover, the court found, "in light of Mr. Gaulden's continued denial [of] some of the offenses encompassed in the plea offer, he has failed to show that he would have successfully completed the plea colloquy and that the Court would have accepted the plea." The court concluded that appellant had not demonstrated either that his counsel performed deficiently in connection with the plea offer or that he suffered prejudice from counsel's allegedly ineffective advice.

"We see nothing in the record that required the trial court to reject the 'strong presumption' that trial counsel's strategic analysis and advice [about the plea offer] were reasonable."[25] We defer to the credibility assessments of the trier of fact. It is indeed incredible (and contrary to Klein's testimony) that defense counsel promised appellant on the day of trial to present exculpatory evidence he did not have at that point and could not obtain. As for whether appellant understood the details of the plea offer, we can look to appellant's answers in court at the time the plea offer was put on the record. The trial court asked appellant if he "underst[oo]d the nature of the plea offer" and if he had "had enough time to discuss it with [his] attorneys." Appellant replied "[y]es, sir" to both questions.

---

[25] *Ruffin*, 25 A.3d at 8 (quoting *Strickland*, 466 U.S. at 689).

When the court asked appellant if he "want[ed] any additional time," he declined it. And in any event, to show the requisite prejudice to support his claim of ineffectiveness, appellant needed to show, among other things, that but for the ineffective advice of counsel, there was a reasonable probability he would have accepted the plea offer and the court would have accepted his plea.[26] Given appellant's insistence even at the time of the § 23-110 hearing on his factual innocence, we cannot fault the court determination that appellant failed to make that necessary showing.

### E. Failure to Present Evidence of Permanent Physical Injury

Appellant claims Klein was ineffective in failing to present evidence of his physical inability to run, which appellant attributed to a shooting he suffered around 1990 as a teenager. He argues this evidence would have negated the testimony of the three eyewitnesses who identified him as the man they saw running with a firearm into an apartment building on June 22, 2006, to escape the police—the testimony that supported the firearm charges against appellant.[27] The

---

[26] *See Lafler v. Cooper*, 566 U.S. 156, 164 (2012).

[27] Appellant notes that his previous defense counsel presented some evidence of his physical injury at his first trial (including displaying his scar to the

*(continued…)*

trial court ruled that appellant failed at the § 23-110 hearing to establish that he was physically impaired and unable to run; found Klein's "decision not to attempt to build a defense around defendant's alleged inability to run to be reasonable and 'considered sound trial strategy'"[28]; and concluded that appellant had not demonstrated a reasonable probability that, but for this supposed error, he would have been acquitted on any count.

At the § 23-110 hearing, appellant claimed that Klein told him he simply had forgotten to collect and present the physical impairment evidence. Klein testified that he recalled reviewing appellant's medical records but could not recall why he decided not to present evidence to show that appellant was physically incapable of running from the police. We therefore look first at whether appellant has shown *Strickland* prejudice.

---

*(...continued)*
jury), which ended in a mistrial after the jury could not reach a unanimous verdict. (According to the trial court, the jury in that trial voted 11-1 in favor of conviction.) The first trial encompassed only the firearm charges; the jury in that trial heard no evidence that appellant had threatened the eyewitnesses against him. Like the trial court, we attach no significance to the fact that the first trial ended in a mistrial.

[28] Quoting *Strickland*, 466 U.S. at 689.

Appellant had the opportunity to demonstrate prejudice at the evidentiary hearing by presenting the evidence his counsel could have presented at trial. He offered the following evidence. He introduced two x-rays of his pelvic bone that were taken in 2010, four years after witnesses say they saw him running from the police. He testified that the x-rays showed buckshots that remained lodged in his pelvic bone from when he was shot in the spine and hip with a 12-gauge shotgun at age fourteen. This shooting, he claimed, left him unable to run.[29] Appellant acknowledged, however, being able to engage in other strenuous physical activity—doing pushups and squats, playing basketball, lifting weights, engaging in manual labor as a bricklayer—and that in 2002 he had fled from police by jumping off a balcony. Appellant did not present any medical testimony or other medical evidence supporting his assertion that he was unable to run.

Appellant called only his sister, Meewah Bell, as a witness to support his claim of physical incapacity to run. She testified that she had not seen appellant run since he was shot in the back as a young teen. After the injury, she said, "he wasn't able to go with [her] . . . to the gym and do things that [she] would do."

---

[29] We note that because appellant chose not to testify at trial, it cannot be presumed that the jury would have heard his testimony.

When asked whether appellant had ever told her that he could not run, Ms. Bell replied:

> Yeah. Because I asked him if he wanted to go work out, if he was able to do anything. He'd just like walk or just limit himself, but not run. "I couldn't work out with you back at the gym."

On cross-examination, Ms. Bell admitted that appellant had jumped from a balcony at some point after the shooting incident as a teen.

The evidence on which appellant relied—his and his sister's testimony, uncorroborated by any expert medical testimony or other independent witnesses—was hardly sufficient, in our view, to support a finding of a "reasonable probability that [the jury] would have returned with a different [verdict]"[30] if it had heard that testimony. Appellant's reluctance to exert himself in the same manner as his sister during workouts and the fact that his sister had never seen him run since the accident in no way prove that appellant was medically incapable of running when startled by the police while illegally in the possession of a gun. As the trial court stated,

---

[30] *Cosio*, 927 A.2d at 1132 (quoting *Wiggins v. Smith*, 539 U.S. 510, 535-36 (2003)).

> Mr. Gaulden's own testimony presents conflicting stories as to his physical abilities, which undercuts the strength of his claim. The testimony of Ms. Bell is similarly unpersuasive in that it merely repeats what she heard from Mr. Gaulden without offering anything more. Mr. Gaulden also chose not to produce testimony or affidavit of a qualified medical professional regarding his limited physical abilities.

And as the trial court also pointed out, appellant's prison medical records (part of the government's evidence at the hearing) "substantially weaken[ed]" appellant's claim of physical inability to run. The medical records report, for example, that in January 2002, appellant stated he had no permanent injury resulting from the gunshot wound to his lower back; that while appellant was incarcerated he was injured at least twice (in 2007 and again in 2011) playing basketball; and that appellant "does not experience prob[lems]s with activity." The records contain no report of an impaired ability to run or similar physical limitations.

The evidence in its totality supports the trial court's conclusion that appellant was not prejudiced within the meaning of *Strickland* by his counsel's failure to raise the physical impairment issue at trial.

**III.**

For the foregoing reasons, we affirm the judgment of the Superior Court denying appellant's motion for relief pursuant to D.C. Code § 23-110 on claims of ineffective assistance of counsel.