**Kelvin FREEMAN, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 00–CF–1604, 06–CO–1547.**

District of Columbia Court of Appeals.

Argued April 29, 2008.
Decided May 14, 2009.

24. *Id.* at 82, 121 S.Ct. 513.

25. *Id.*

Cheryl D. Stein for appellant.

John P. Mannarino, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Thomas J. Tourish, Jr., Kenneth C. Kohl, and Joan Draper, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges, and ROSS, Associate Judge, Superior Court of the District of Columbia.[1]

BLACKBURNE–RIGSBY, Associate Judge:

Appellant Kelvin Freeman was convicted, following a third jury trial, of two counts of first-degree premeditated murder while armed, one count of first-degree burglary while armed, one count of possession of a firearm during a crime of violence, and one count of carrying a pistol without a license.[2] On appeal, he challenges the trial court's disqualification in his first trial of his retained counsel and the trial court's refusal to reinstate that counsel at his third trial. He also contends that the trial court abused its discretion by denying, without a hearing, his D.C.Code § 23–110 motion to vacate his conviction based upon ineffective assistance of counsel at his third trial. Finding no error, we affirm.

## I. FACTUAL BACKGROUND

Bettie Jean Cherry and Frank Luckett were found shot to death inside their apartment located at 323 L Street, S.E., Washington, D.C. on September 11, 1991. They were the mother and stepfather, respectively, of Comelia Cherry,[3] with whom appellant Kelvin Freeman had a son.

The government presented evidence that Mr. Freeman had been fighting with Comelia over money, his drug use, and their son, and that she had complained to his parole officer about his threatening behavior, which led to the issuance of an arrest warrant for violating his parole. Mr. Freeman repeatedly had threatened to kill Comelia, but more recently had told her that he would not kill her, because their son needed a mother, but that he would "punish [her] and make [her] suffer." Mark Monroe and Melissa Hargrove were in another apartment in the same building as Comelia's parents on the night of the murders. They identified Mr. Freeman as the man they saw leaving the apartment and wiping off, what appeared to them to be, a firearm before placing it in his waistband. The government's witnesses testified that Mr. Freeman had "bragged" to four people, including government witness Cornell Thomas, that he had killed Comelia's parents to punish her.

The defense presented evidence that the government's witness, Cornell Thomas, asked one of his fellow inmates, Frederick Miller, to obtain as much information as possible about several other inmates, including Mr. Freeman, because Mr. Thomas planned to "put [that information] to-

---

1. Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

2. Respectively, the citations are D.C.Code §§ 22–2401, –3202, –1801(a), –3204(b), and– 3204(a) (2001).

3. Because of the shared surname between Bettie Jean Cherry and her daughter Comelia, we will refer to each of them by their first names for clarity's sake.

gether and testify to some things and [that Mr. Thomas] was going to make a deal with the government." Mr. Miller testified that he did not provide any of the requested information to Mr. Thomas. On cross-examination, Mr. Miller conceded that Mr. Thomas never said that he intended to lie and that he only wanted information. Other inmates who were incarcerated with Mr. Thomas testified that Mr. Thomas studied Mr. Freeman's legal materials "three, four times a week," that Mr. Thomas asked other inmates about the status of Mr. Freeman's case, and that Mr. Thomas stated his intent to cooperate with the government to reduce his sentence. Timothy Williams, who also had been incarcerated with Mr. Thomas, testified that he "caught [Mr. Thomas] several times informing" on other inmates, and that Mr. Freeman had left property with Mr. Thomas while they were incarcerated at the same facility.

Defense investigator Howard Weiner testified regarding written statements he took from Mr. Monroe and Ms. Hargrove, in which they expressed uncertainty regarding their observations on the night of the murders. Mr. Weiner conceded on cross-examination that Ms. Hargrove was "scared about going to court" against Mr. Freeman. Mr. Freeman's former girlfriend Stephanie Lee testified that, on the night of the murders, Mr. Freeman was in her apartment when she left for work and was there when she returned in the morning. Her son testified that Mr. Freeman babysat him and his brother while his mother was at work and that Mr. Freeman did not leave them unattended during that time.

Mr. Freeman denied committing the murders and denied that he had confessed about committing the murders. Mr. Free-

man also testified that he had never met Mr. Miller.

## II. PROCEDURAL HISTORY

Mr. Freeman's first jury trial began on August 30, 1999, before the Honorable Ann O'Regan Keary and resulted in a mistrial when the jury was unable to reach a unanimous verdict. His second jury trial began on May 16, 2000, before Judge Keary and also resulted in a mistrial when the jury was unable to reach a unanimous verdict. Mr. Freeman's third jury trial began on August 23, 2000, before Judge Keary, and the jury returned guilty verdicts on all counts charged in the indictment, with the exception of the possession of a firearm during the commission of a crime of violence charge (PFCV) predicated upon Mr. Luckett's murder, on September 25, 2000.[4] On November 17, 2000, the trial court sentenced Mr. Freeman to a total of fifty-six years to life imprisonment, with a forty-year mandatory minimum sentence. Mr. Freeman timely appealed.

On April 7, 2004, Mr. Freeman moved to vacate his convictions under D.C.Code § 23–110, alleging ineffective assistance of counsel. The trial court denied the petition without a hearing on October 31, 2006. Mr. Freeman timely appealed.

## III. ANALYSIS

**A. The Trial Court's Initial Disqualification In The First Trial And Denial Of Mr. Freeman's Motion To Reinstate His Retained Counsel Jonathan Stern In The Third Trial.**

Mr. Freeman contends that the trial court abused its discretion by disqualifying his retained counsel, Jonathan Stern, in the first trial and by refusing to reinstate

4. This PFCV count was inadvertently omitted from the verdict form and was not addressed by the jury. On December 1, 2000, the trial court dismissed this remaining PFCV count.

him at the third trial, because there was no conflict of interest. Mr. Freeman argues that the trial court was required to accept the waivers of any conflict that existed and that changed circumstances warranted the reinstatement of Mr. Stern in the third trial. We hold that the trial court did not abuse its discretion in its disqualification or denial of the motion to reinstate Mr. Stern because an actual conflict of interest existed. Further, the trial court had discretion to refuse the waivers, and the defense counsel failed to apprise the trial court of changed circumstances warranting reinstatement.

### 1.  Background

On July 7, 1998, Jonathan Stern, who had been retained by Mr. Freeman, entered his appearance in the case as defense counsel. Three months later, in October 1998, Mr. Stern filed an *ex parte* pleading. The pleading advised the Honorable Mary Ellen Abrecht, who was assigned the case at the time, that he planned to call Navarro Hammond—whom he had previously represented in an unrelated murder case—to testify as a witness at Mr. Freeman's trial. Mr. Stern advised the trial court that he expected Mr. Hammond would testify that he and another man, who also would appear as a defense witness, had committed the murders with which Mr. Freeman was charged. In his *ex parte* pleading, Mr. Stern recognized that this strategy presented a conflict of interest and asked the trial court to appoint counsel for Mr. Hammond so that Mr. Stern could determine whether Mr. Hammond would agree to waive any conflict of interest.

By an order dated October 23, 1998, Judge Abrecht found that "there is a conflict of interest and there can be no effective waiver by the former client [Mr. Hammond]." Judge Abrecht ordered Mr.

Stern to withdraw, which he did on November 2, 1998. On December 1, 1998, Richard Gilbert, who had been appointed by the trial court, entered his appearance as defense counsel.

On January 25, 1999, Mr. Freeman acting *pro se*, with Mr. Gilbert serving as his attorney advisor, filed a motion seeking reconsideration of Judge Abrecht's order and requesting that Mr. Stern be reinstated as defense counsel before Judge Keary, who had taken over the case from Judge Abrecht at this point. The motion noted that the defense had obtained a written waiver from Mr. Hammond. The government filed a written opposition to this motion, arguing *inter alia*, that the conflict was unwaivable. At a hearing on February 12, 1999, the trial court denied Mr. Freeman's motion to reinstate Mr. Stern as defense counsel.

Although Judge Keary noted that Judge Abrecht's ruling was the law of the case, Judge Keary explained in detail that she agreed with the substance of the prior order, because the conflict was "unresolvable." Judge Keary refused to appoint counsel to advise Mr. Hammond on his Fifth Amendment rights, finding that it was "wholly unnecessary" to do so in light of the decision not to reinstate Mr. Stern as defense counsel.

Before Mr. Freeman's third trial, defense counsel renewed his motion to reinstate Mr. Stern. The trial court denied the motion, finding that "the situation has not changed and there is no more merit to the motion[ ] than the Court found originally to exist." The government's witness, Mr. Thomas, testified at the third trial that Mr. Freeman told him that he planned to have Mr. Hammond and another individual falsely confess to the murders to exonerate him and that Mr. Stern was Mr. Hammond's attorney.

## 2. The Initial Disqualification In The First Trial

We review the trial court's decision to disqualify Mr. Stern due to a conflict of interest raised at the first trial for an abuse of discretion. *Pinkney v. United States*, 851 A.2d 479, 486, 490 (D.C.2004). The trial court's determination of whether a conflict of interest exists "presents a mixed question of law and fact," so we accept the trial court's factual findings unless they lack evidentiary support, and we review the legal issues *de novo*. *Veney v. United States*, 738 A.2d 1185, 1193–95 (D.C.1999).

"The Sixth Amendment guarantees the accused in a criminal case the right to the effective assistance of counsel for his or her defense." *Gibson v. United States*, 632 A.2d 1155, 1158 (D.C.1993). "The first essential element of effective assistance of counsel is counsel's ability and willingness to advocate fearlessly and effectively on behalf of his client." *Douglas v. United States*, 488 A.2d 121, 135 (D.C.1985) (internal citations and quotation marks omitted). The erroneous deprivation of a defendant's right to retain counsel of choice is a structural error, which entitles a defendant to a reversal of his conviction without a requirement of prejudice. *United States v. Gonzalez–Lopez*, 548 U.S. 140, 145, 150, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). A defendant's right to counsel of choice is not absolute; it may be limited, *inter alia*, by the trial court's "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *Id.* at 152, 126 S.Ct. 2557 (internal citations omitted). "[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Pinkney, su-*

*pra*, 851 A.2d at 486–87 (internal quotation marks omitted) (quoting *Wheat v. U.S.*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)). Moreover, the trial court has an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 489 (quoting *Wheat, supra*, 486 U.S. at 160, 108 S.Ct. 1692).

Whenever "a constitutional right to counsel exists, . . . there is a correlative right to representation that is free from conflicts of interest." *Singley v. United States*, 548 A.2d 780, 783 (D.C.1988) (quoting *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981)). "Encompassed within the Sixth Amendment's guarantee of effective assistance of counsel is the right to representation by counsel whose loyalty is undiluted by conflicts of interest." *Fitzgerald v. United States*, 530 A.2d 1129, 1133 (D.C.1987) (footnote omitted). "The danger of an attorney's conflict of interest is that the 'attorney may forego efforts he would ordinarily undertake on behalf of one client, in order that the other client may not thereby be harmed.'" *Derrington v. United States*, 681 A.2d 1125, 1133 (quoting *Fitzgerald, supra*, 530 A.2d at 1133).

"To protect this right to conflict-free counsel, the trial court has an affirmative 'duty to inquire' into the effectiveness of counsel whenever 'the possibility of conflict' becomes apparent before or during trial." *Douglas, supra*, 488 A.2d at 136 (quoting *Wood, supra*, 450 U.S. at 272, 101 S.Ct. 1097 (emphasis in original)). "If such an inquiry reveals that an actual conflict of interest exists, and the defendant objects to continued representation by the conflict-burdened attorney, new counsel must be appointed. Indeed, a failure to appoint new counsel under these circum-

stances will lead to a reversal of any conviction obtained at trial." *Douglas, supra,* 488 A.2d at 136 (citing *Holloway v. Arkansas,* 435 U.S. 475, 487–91, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)).

In this case, Judge Abrecht properly recognized the competing constitutional rights at stake—the right to retain counsel of choice versus the right to conflict-free counsel. Mr. Stern himself recognized that his proposed strategy of calling his former client, Mr. Hammond, to testify that he had committed the murders with which his current client, Mr. Freeman, was charged presented a conflict of interest, for which he believed he needed to obtain a waiver. We have held that a counsel's belief about the existence of a conflict of interest and what course of action is necessary is "significant." *See Gibson, supra,* 632 A.2d at 1158 n. 14 (stating that "[i]t is significant" whether counsel believed conflict of interest "was so real as to oblige him to seek leave to withdraw from the case"). The trial court recognized that Mr. Stern's duties to his clients were in direct conflict. In order for Mr.

Stern to represent his current client, Mr. Freeman, "zealously and diligently within the bounds of the law," Mr. Stern would have to elicit the most detailed and inculpatory confession on the stand from Mr. Hammond, when he was prohibited from exploiting any privileged information or any other information gained during the representation which would prove embarrassing or detrimental to Mr. Hammond or be in a position where his judgment may be affected by his duties to his current client, Mr. Freeman. *See* D.C. Rules of Prof'l Conduct R. 1.3 (duty of zealous and diligent representation); 1.6 (duty not to use or reveal client confidences and secrets without client's informed consent),[5] 1.7(b)(4), (c)(1) (representation prohibited where lawyer's judgment may be affected by duties to other parties without the client's informed consent).[6] While the violation of a rule of professional conduct does not necessarily prove that the Sixth Amendment right to counsel has been violated, "[t]he rules do provide guidance, however, and can shed light on counsel's perceived constraints" because we have

---

**5.** As discussed *infra* p. 14, even with the client's informed consent, the court is not obligated to accept a waiver because of the wide latitude accorded to trial courts in balancing the right to counsel of choice against other interests. *See Gonzalez–Lopez, supra,* 548 U.S. at 152, 126 S.Ct. 2557.

**6.** It is a close case as to whether D.C. Rules of Prof'l Conduct R. 1.9 (duty to former client not to represent another client in the same or substantially related matter with "materially adverse interests to the former client") applies here. Even though Mr. Stern previously represented Mr. Hammond in an unrelated murder case, the subject matter of that prior representation may still be deemed "substantially related" to Mr. Freeman's representation. In *Pinkney,* we concluded that the trial court did not abuse its discretion in disqualifying the defendant's attorney based on a conflict of interest, where the attorney previously represented a government witness in an unre-

lated criminal case. *Pinkney, supra,* 851 A.2d at 488. There, we explained that while "[i]t is clear that [the defense attorney's] representation of [the government witness] was not substantially related to the subject matter of appellant's trial—i.e., the facts surrounding the killing … because [the] appellant's defense would necessarily involve refuting [the government witness's] testimony, it would consist of mostly attacking his credibility on cross-examination." *Id.* Therefore, "because impeachment of [the witness] would be an important part of the defense, issues concerning [the witness's] credibility were therefore 'substantially related' to [the defense attorney's] representation of appellant." *Id.* Nevertheless, our analysis does not hinge on the applicability of D.C.R. Prof'l Conduct 1.9 because under *Pinkney,* it is sufficient that an attorney's loyalties be divided to constitute a conflict of interest. *Pinkney, supra* 851 A.2d at 487.

recognized that an attorney's subjective belief "that a conflict is present, while not conclusive, is strong evidence of an actual conflict." *McCrimmon v. United States,* 853 A.2d 154, 164 (D.C.2004) (citations omitted); *see also id.* (citing *Mickens, supra,* 535 U.S. at 172–73, 122 S.Ct. 1237 ("holding that reversal for conflict requires showing of effect on counsel's performance")). Moreover, "[a]n actual conflict in successive representation may arise where the subject matter of the previous representation is substantially related to the case being tried, the attorney reveals privileged communications of the former client stemming from the previous representation, or the attorney's loyalties are otherwise divided." *Pinkney, supra,* 851 A.2d at 487 (quoting *Veney, supra,* 738 A.2d at 1193) (emphasis in original).

An actual conflict of interest was present here because Mr. Stern, in representing his current client, Mr. Freeman was in a position to take advantage of his former client, Mr. Hammond's confidences and secrets. His loyalties, therefore, were divided between both Mr. Freeman and Mr. Hammond. *Cf. Veney, supra,* 738 A.2d at 1193–95 (citations omitted) (no indication attorney "was ever in a position to use confidential information obtained from [the former client] in [the current client's] defense" when the former client was not called as a witness and the attorney "faced no decision over whether he could use previously acquired confidential information to cross-examine him"). As Judge Abrecht noted, it would have been "impossible for [Mr. Stern] to know and reveal to [Mr. Hammond] in advance all possible questions" that Mr. Hammond would encounter on direct examination by him and cross-examination by the government while still "zealously representing [Mr.]

Freeman." By seeking to provide the best defense to Mr. Freeman—a sworn confession to the very crime with which he was charged—Mr. Stern needed to act in the most detrimental way to his former client by eliciting the most damning confession on the stand possible. The possibility existed that Mr. Stern might improperly rely on confidences, secrets, or other information obtained in his prior representation of Mr. Hammond in a murder case. Mr. Stern also might not have objected to particular lines of inquiry by the government on cross-examination, or he might not have conducted redirect examination in order to advance Mr. Freeman's defense. Although the trial court did not elaborate in her *ex parte* order, it is clear from the record that the trial judge properly appreciated that the risk was too great that Mr. Stern could have favored one client over the other. Given the present charge of murder, and Mr. Stern's previous representation of Mr. Hammond in an unrelated murder case, Mr. Stern is likely familiar with Mr. Hammond's criminal history (possibility the existence of undiscovered impeachable convictions), modus operandi (possible similarities between the two murders), and personality (a factor that cannot be underestimated in formulating effective cross-examination). *See Pinkney, supra,* 851 A.2d at 488 ("[T]he danger in not protecting the former client's confidences could be 'highlighted by the nature of the questioning that can be anticipated.'") (citations omitted).

Although Mr. Freeman contends that this conflict was waivable by both Mr. Hammond and Mr. Freeman, the trial court was not obligated to accept that waiver because of the wide latitude accorded to trial courts in balancing the right to counsel of choice against other interests.[7]

---

**7.** Because the trial court was not required to accept the waivers, we do not reach the issue

of the validity of Mr. Hammond's proffered waiver.

*Gonzalez–Lopez, supra,* 548 U.S. at 152, 126 S.Ct. 2557 (internal citations omitted). Moreover, the trial court had an "independent interest" in this case of "ensuring that [the trial was] conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.*(quoting *Wheat,* supra 486 U.S. at 160, 108 S.Ct. 1692). We adopt the United States Supreme Court's admonition that:

> [u]nfortunately for all concerned, a [trial court] must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials....
>
> Other [trial courts] might have reached differing or opposite conclusions with equal justification, but that does not mean that one conclusion was "right" and the other "wrong." [Trial courts] must recognize a presumption in favor of [a defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict[8] but by a showing of a serious potential for conflict.

*Wheat, supra,* 486 U.S. at 162–64, 108 S.Ct. 1692. Given the facts before Judge Abrecht at the first trial, there was an actual conflict of interest that warranted the trial court's exercise of its discretion in refusing the proffered waiver and disqualifying counsel. The trial court, therefore, did not abuse its discretion in disqualifying Mr. Stern in the first trial.[9]

### 3. The Denial Of The Renewed Motion To Reinstate At The Beginning Of The Third Trial

Having held that the court's original disqualification of Mr. Stern in the first trial was not an abuse of discretion, we now turn to the separate issue of whether the trial court abused its discretion in denying Mr. Freeman's motion to reinstate Mr. Stern in the third trial. "The grant or denial of such a motion is, again, a matter within the trial court's discretion." *See Pinkney, supra,* 851 A.2d at 490 (citation omitted). A trial court is required to consider reinstatement when the conflict of interest no longer exists. *See id.* (defense counsel discovered during *voir dire* that the government was not intending to call the disqualified defense counsel's former client as a witness and alerted trial court to the change in circumstances).

▆ Judge Keary did not abuse her discretion by denying defense counsel's

---

**8.** In her October 26, 1998, *Ex Parte* Order to Defense Counsel, Judge Abrecht provided three reasons for why there was a conflict of interest as a matter of law, for which "there can be no effective waiver" obtained by Mr. Hammond:

> [1]To exculpate Defendant Freeman, counsel would have to present evidence against his former client or solicit his former client to confess and testify. [2] Moreover, counsel could not examine a former client effectively without taking advantage of client confidences. [3] The former client could not give an effective waiver to allow such

questioning because it would be impossible for counsel to know and reveal to the witness in advance all possible questions while at the same time zealously representing Defendant Freeman.

**9.** Given our disposition, we need not decide whether appellant may even properly contest Mr. Stern's disqualification from the first trial—i.e., whether that issue has not, instead, been subsumed within the issue we next address of whether the judge properly denied reinstatement.

first motion to reinstate Mr. Stern before the first trial. Although the defense had obtained a written waiver from Mr. Hammond, who also asserted that he would be available for the court's examination of his waiver on the record, Judge Keary was correct in noting that "the situation that [existed when Judge Abrecht] reached her decision [to disqualify wa]s not markedly changed by the addition of the provision of a written waiver." Judge Keary referenced the discretion to disqualify counsel in light of the trial court's independent interest in ensuring the trial was conducted according to the profession's ethical standards and that the proceedings appeared fair to those who observe them as another basis for her decision. *See Gonzalez–Lopez, supra,* 548 U.S. at 152, 126 S.Ct. 2557 (quoting *Wheat, supra,* 486 U.S. at 160, 108 S.Ct. 1692). Indeed, the soundness of Judge Abrecht's initial ruling—and Judge Keary's decision not to reinstate Mr. Stern as defense counsel—is buttressed by the fact that Mr. Gilbert noted that Mr. Stern "[could not] even promise that he wouldn't inadvertently mentally rely on information known to him previously" through his representation of Mr. Hammond.

Furthermore, Judge Keary recognized that "[t]here is no telling what could develop at trial if Mr. Stern were reinstated as counsel" and that the trial court was in the untenable position of choosing between not reinstating conflict-burdened counsel and having the defendant appeal the denial of his right to retained counsel of choice, or accepting Mr. Hammond's waiver of the conflict, and proceeding with conflict-burdened counsel, having the defendant challenge the effectiveness of the counsel based on his right to conflict-free counsel. *See Wheat, supra,* 486 U.S. at 161, 108 S.Ct. 1692 ("trial courts confronted with multiple representations face the prospect of being 'whip-sawed' by assertions of er-

ror no matter which way they rule," which supports the need to grant them wide latitude in deciding whether to disqualify counsel).

Although Judge Keary acknowledged Mr. Freeman's preference to be represented by Mr. Stern, Judge Keary explained that the conflict of interest, the trial court's independent interest, and the lack of any change in circumstances, including the fact that Mr. Stern was not available for the first trial date, were among several factors the trial court considered. *See Gonzalez–Lopez, supra,* 548 U.S. at 152, 126 S.Ct. 2557 (reaffirming trial court's wide latitude in "balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar") (internal citations omitted). Therefore, the trial court properly exercised its discretion in denying the motion for reinstatement before the first trial.

▮ For the same reasons as discussed above, we hold that the trial court did not abuse its discretion in denying defense counsel's renewed motion to reinstate Mr. Stern before Mr. Freeman's third trial, because the trial court properly noted that "the situation has not changed and there is no more merit to the motion[ ] than the Court found originally to exist."

Now, for the first time on appeal, Mr. Freeman asserts that the defense had "abandoned" Mr. Hammond as a witness before the beginning of the third trial, and thus the trial court abused its discretion by refusing to reinstate Mr. Stern. Although defense counsel may have intended to "abandon" Mr. Hammond as a witness, thereby eliminating the conflict of the interest that prevented Mr. Stern from serving as counsel, this "change in circumstances" was not brought to the attention of the trial court at the beginning of the third trial nor did defense counsel make

such an argument. Instead, defense counsel's motion for reinstatement at the beginning of the third trial made a bare and vague reference to reinstatement. Defense counsel did not present the trial court with a list of defense witnesses until *after* the government's case-in-chief and *after* the defense commenced the direct examination of its own witnesses. It is significant that defense counsel did not renew its motion to reinstate Mr. Stern when it presented the trial court with its list of defense witnesses. Further, defense counsel did not address the possibility that it might call Mr. Hammond as a rebuttal witness to Mr. Thomas' testimony that Mr. Freeman informed him that Mr. Hammond, who was a client of his attorney, Mr. Stern, and another man would falsely confess to the murders to exonerate him. In sum, defense counsel's failure to renew its motion to reinstate Mr. Stern after the government's case-in-chief, its failure to apprise the trial court that it did not intend to call Mr. Hammond as either a direct or rebuttal witness, and its failure to assert any other change in circumstances distinguishes this case from *Pinkney*. In *Pinkney*, where as soon as defense counsel realized during *voir dire* that the government was no longer going to call the witness that presented a conflict with defendant's counsel of choice, defense counsel alerted the trial court of the change in circumstances and immediately moved for reinstatement. 851 A.2d at 490 (acknowledging defense counsel was in the best position both at the beginning of and after the government's case-in-chief in the third trial to know—and to inform the trial court—of whether Mr. Hammond would testify). Although the trial court is obliged to consider a change in circumstances warranting a reconsideration of its decision to disqualify counsel, it is not obligated to do so *sua sponte*. This is particularly so where the error appellant now complains of is one the appellant allowed the trial court to make by failing to apprise the Court of the changed circumstances when it had the opportunity and was in the best position to do so both before trial and during the defense's case. *See id.*(defense counsel promptly alerted trial court to the change in circumstances); *Cowan v. United States*, 629 A.2d 496, 502–03 (D.C.1993) (rejecting counsel's request for self-defense and defense of a third person jury instruction under the invited error doctrine when defense counsel failed to make clear that his initial position had changed, and thus induced trial court to fail to give those instructions).

In conclusion, the trial court did not abuse its discretion in disqualifying or refusing to reinstate Mr. Stern as Mr. Freeman's defense counsel in the first and third trials, respectively.

## B. The Trial Court's Denial Without A Hearing Of Mr. Freeman's D.C.Code § 23–110 Motion, Alleging Ineffective Assistance Of Counsel In His Third Trial.

Mr. Freeman contends that his defense counsel at the third trial rendered ineffective assistance of counsel due to his defense counsel's failure to move to withdraw on the basis of a potential conflict of interest with a defense witness, which prejudiced Mr. Freeman's case, and that the trial court abused its discretion by denying his D.C.Code § 23–110 motion without a hearing. We hold that the trial court did not abuse its discretion by denying the motion without a hearing, and defense counsel did not render ineffective assistance of counsel.

### 1. Background

On September 12, 2000, during the third week of Mr. Freeman's third trial, Mr.

Gilbert informed the court during an *ex parte* bench conference that he would be calling Timothy Williams as a witness and that he had previously represented Mr. Williams, which he had already disclosed to the court in an *ex parte* pleading. Mr. Gilbert noted that the representation lasted "about four or five months, and there was nothing that Mr. Williams said to [him] during the representation that was incriminating." It is unclear from the record whether Mr. Freeman was apprised of the prior representation. Upon being questioned by the trial court, Mr. Freeman and Mr. Williams, who had separate counsel, agreed to waive any conflict of interest arising from this prior representation. Mr. Williams was not cross-examined as to his prior representation by Mr. Gilbert, and on appeal Mr. Freeman does not challenge this representation as a ground for his ineffective assistance of counsel claim.

On the morning of September 13, 2000, before the cross-examination of defense witness Mr. Miller resumed, Mr. Gilbert advised the trial court that he had previously represented Mr. Miller in two separate murder cases. The first murder case had gone to trial "many years ago" and "ended in a complete acquittal," while the other murder trial was in February 1999 and had ended in a mistrial when Mr. Gilbert withdrew due to a conflict of interest. Different counsel represented Mr. Miller at the retrial, where Mr. Miller was acquitted. The government argued that Mr. Gilbert's late disclosure here was similar to his late disclosure of a conflict of interest in Mr. Miller's case, which had led to a mistrial. Mr. Gilbert explained that neither of Mr. Miller's two previous cases were related to Mr. Freeman or his case.

The trial court was surprised that Mr. Gilbert raised the issue of a conflict of interest with regards to his prior represen-

tation of Mr. Williams, but failed to raise the issue of a potential conflict with respect to his representation of Mr. Miller. Mr. Gilbert had a "much less significant" relationship with Mr. Williams than he did with Mr. Miller, and Mr. Gilbert's representation of Mr. Miller overlapped with his representation of Mr. Freeman. The government asked for and received permission to cross-examine Mr. Miller about his prior representation by Mr. Gilbert. The government argued that Mr. Gilbert's concurrent representation of Mr. Freeman and Mr. Miller may have created a bias for Mr. Miller to testify favorably because both of Mr. Miller's cases had resulted in acquittals.

The trial court asked Mr. Freeman whether, after hearing the discussion "of the awkward situation of a witness being called in your case who was previously represented by your attorney, Mr. Gilbert," he would waive any conflicts of interest that "may be involved in the fact that [Mr. Gilbert] knows some information about Mr. Miller by having represented him in the past?" After consulting with Mr. Gilbert, Mr. Freeman agreed to waive the conflict and stated, "[n]o, I don't have a conflict."

The trial court then conducted a colloquy with Mr. Miller, who was not provided with his own counsel, and explained that he might be questioned about Mr. Gilbert's prior representation of him, and about the fact that the prior cases involved murder charges. Mr. Miller replied that he did not "have a problem ... as long as it don't get into asking questions about what me and Mr. Gilbert went through, I ain't got no problem. I waive all the rights." When Judge Keary explained that Mr. Miller might be asked questions about the earlier cases, he responded "I might waive it on that—on that issue, I might waive—I might not like that. I don't want to get

into that." After additional colloquy where Mr. Miller expressed his desire not to have "the word murder even mentioned," Judge Keary asked Mr. Miller whether he was waiving the conflict of interest and Mr. Miller replied "yes."

### 2. *Analysis*

We review the trial court's denial of appellant's D.C.Code § 23–110 motion without a hearing for an abuse of a discretion. *Webster v. United States,* 623 A.2d 1198, 1206 (D.C.1993). "To uphold the denial of [appellant's D.C.Code] § 23–110 motion without a hearing, this court must conclude that under no circumstances could [appellant] establish facts warranting relief." *Wright v. United States,* 608 A.2d 763, 766 (D.C.1992). Although a hearing is particularly appropriate when ineffective assistance of counsel is alleged, an evidentiary hearing is not required in every case. *See Head v. United States,* 626 A.2d 1382, 1385 (D.C.1993) (internal citations omitted). When "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief," a hearing is not necessary. D.C.Code § 23–110(c); *see also Head, supra,* 626 A.2d at 1387 ("appellant [must] show that the trial judge could not properly decide the motion on the basis of the files and records of the case"). We have identified three categories of claims that warrant summary dismissal: "(1) vague and conclusory allegations, (2) palpably incredible claims, and (3) assertions that would not merit relief even if true." *Ramsey v. United States,* 569 A.2d 142, 147 (D.C.1990) (citations omitted). Because the allegations contained in appellant's motion can fairly be characterized as falling into these categories, we find no error by the trial judge in denying the motion without a hearing.

An appellant alleging the constitutional ineffectiveness of his trial counsel must demonstrate both deficient performance and prejudice in order to merit relief under D.C.Code § 23–110. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A claim of ineffective assistance of counsel based on attorney's actual conflict of interest, however, is evaluated under a less stringent standard than the conventional *Strickland* claim. *Chase v. United States,* 656 A.2d 1151, 1154, n. 7 (D.C.1995) (citations omitted). "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an *actual* conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (emphasis added). "[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Id.* at 349–50, 100 S.Ct. 1708 (citing *Holloway, supra,* 435 U.S. at 487–91, 98 S.Ct. 1173). "But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id.* at 350, 100 S.Ct. 1708 (citation omitted). "[T]he possibility of conflict is insufficient to impugn a criminal conviction." *Id.* To make the requisite showing, the appellant must be able to "point to specific instance[s] in the record to suggest an actual conflict or impairment of [his] interests," *Fitzgerald, supra,* 530 A.2d at 1138 (citation and internal quotation marks omitted), as opposed to "those that are merely speculative or hypothetical." *Gibson, supra,* 632 A.2d at 1159. "[I]t is important to note that overemphasis on the presumption of prejudice cannot operate to obviate the requisite obligation to demonstrate the existence of an actual conflict of interest." *United States v. Gambino,* 864 F.2d 1064, 1070 (3d Cir.1988).

■ "The situation is different where a defendant has shown only a *potential* conflict of interest, or the *possibility* of a conflict is apparent. If this possibility becomes apparent while the case is before the trial court, the court must inquire into whether an actual conflict exists." *Veney, supra,* 738 A.2d at 1193 (citations omitted). The trial court's determination of whether a conflict of interest exists "presents a mixed question of law and fact," and we accept the trial court's findings of fact unless they lack evidentiary support, and we review the legal issues *de novo. Id.* (citations omitted).

Although we have never articulated a test by which a trial court may determine whether a potential conflict reaches the point at which disqualification is warranted, we have examined the factors articulated by the United States Court of Appeals for the Seventh Circuit in *United States v. O'Malley,* 786 F.2d 786, 793 (7th Cir.1986). *See Pinkney, supra,* 851 A.2d at 487. Under that test, the trial court should evaluate "the interests of the defendant, the government, the witness and the public in view of the circumstances of each particular case," and "examine whether the subject matter of the first representation is substantially related to that of the second," whether "the conflict could cause the defense attorney to improperly use privileged communications in cross-examination," and whether "the conflict could deter the defense attorney from intense probing of the witness on cross-examination to protect privileged communications with the former client." *Id.* at 487–88 (noting that because former client was a government witness, appellant's defense would necessarily involve refuting former client's testimony and consist mostly of attacking his credibility that defense counsel might rely on knowledge gained during the representation).

As a threshold matter, Mr. Freeman abandons his claim raised in the trial court that an actual conflict of interest existed in this case where Mr. Gilbert represented him while representing Mr. Miller. Mr. Freeman does not challenge the trial court's denial of his § 23–110 motion under *Cuyler,* which would afford a presumption of prejudice, so we evaluate the potential conflict of interest under the usual *Strickland* standard. Mr. Freeman also does not challenge Mr. Gilbert's prior representation of defense witness Mr. Williams, who was not cross-examined about the prior representation, as a basis for his § 23–110 motion. Therefore, the only issue before us is whether Mr. Gilbert's "failure to move to withdraw on the basis of his prior representation of [Mr. Miller] meets the *Strickland* standard."

■ First, Mr. Gilbert was not deficient in failing to move to withdraw on the basis of his prior representation of defense witness Mr. Miller, because only a potential conflict of interest existed and Mr. Freeman has failed to "point to specific instance[s] in the record to suggest an actual conflict or impairment of [his] interests," *Fitzgerald, supra,* 530 A.2d at 1138, as opposed to "those that are merely speculative or hypothetical." *Gibson, supra,* 632 A.2d at 1159. As the trial court noted, Mr. Gilbert's decision to call Mr. Miller, who could undermine the credibility of the government's star witness, Mr. Thomas, and his damning testimony about Mr. Freeman's confessions, was "clearly part of a sound trial strategy, even though it did subject Mr. Miller to some bias cross-examination about his prior relationship with Mr. Gilbert." As such, the trial court found that "Mr. Gilbert certainly did not act deficiently in judging that the potential benefit to [Mr. Freeman] from Mr. Miller's testimony would outweigh any potential harm from cross-examination on his bias."

The lack of an actual conflict of interest, as conceded by appellant and as supported by the record, and Mr. Freeman's inability to point to any other "impairment of his interests," *Fitzgerald, supra,* 530 A.2d at 1138, supports the conclusion that there was no deficiency. The alleged possibility of a conflict of interest in this case did not obstruct the use of a particular defense or strategy. In fact, one may argue the existence of the potential conflict of interest enabled Mr. Gilbert initially to identify a witness who would help to discredit the government's case against his client. *See Fitzgerald, supra,* 530 A.2d at 1138.

Moreover, unlike the conflict of interest presented at the first trial with Mr. Stern and Mr. Hammond, here, there was no risk that Mr. Gilbert was in a position to act detrimentally to either of his clients' interests as Mr. Miller's testimony about the unreliability of Mr. Thomas's testimony only helped Mr. Freeman's defense and there was no danger that defending Mr. Freeman zealously would have caused Mr. Gilbert to rely upon confidences or secrets from his representation of Mr. Miller. Unlike Mr. Hammond and Mr. Freeman, the interests of Mr. Miller and Mr. Freeman were not in conflict nor did they risk dividing their shared attorney's loyalties. Unlike Mr. Stern, who "cannot even promise that he wouldn't inadvertently mentally rely on information known to him previously" to the detriment of Mr. Hammond, there was no risk that Mr. Gilbert would do the same. Indeed, Mr. Gilbert asserted repeatedly that "there's nothing that I've had any contact with Mr. Miller about that's resulted in anything impeachable" and "I just simply could not imagine a way in which my [prior] representation [of Mr. Miller] would create a conflict of interest." *See Veney, supra,* 738 A.2d at 1193 (no indication attorney "was ever in a position to use confidential information obtained from [the former client] in [the current

client's] defense" when the former client was not called as a witness and the attorney "faced no decision over whether he could use previously acquired confidential information to cross-examine him").

Mr. Gilbert's subjective belief about the lack of a conflict of interest and his capability as trial counsel is "significant," and the trial court properly considered it. *See McCrimmon, supra,* 853 A.2d at 164. Absent any evidence that Mr. Freeman's interests were impaired, "[t]he possibility of a conflict is insufficient to impugn a criminal conviction." *Cuyler, supra,* 446 U.S. at 350, 100 S.Ct. 1708. Indeed, it is evident from the trial court's reasoning why Mr. Gilbert chose to call Mr. Miller as a witness and why he would have still called him even if Mr. Miller had never been his client. *See Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *see also Gambino,* 864 F.2d at 1071–72 (indicating that attorney would not have advanced defense theory implicating former client that was specious, contradicted physical evidence, and would have undermined the credibility of appellant's defense even if witness was not a former client). Even in the context of actual conflicts of interest, we have held that a "trial attorney's performance is not adversely affected where the best interest of the client 'could have dictated precisely the course suggested' by the trial attorney." *Veney, supra,* 738 A.2d at 1197 (citation omitted).

Applying the factors articulated by the United States Court of Appeals for the Seventh Circuit and examined in *Pinkney* for determining whether a potential conflict reaches the point at which disqualification is warranted, we note that the subject matters of Mr. Gilbert's representation of Mr. Freeman and Mr. Miller were unrelated, there was no risk Mr. Gilbert would improperly use privileged information, and there was no risk that

the conflict could deter Mr. Gilbert from intense probing of Mr. Miller to protect the current client, Mr. Freeman. 851 A.2d at 487 (citing *O'Malley, supra,* 786 F.2d at 793). Unlike the situation in *Pinkney* (former client was subject to cross-examination by defense counsel, who was obligated to attack his credibility and might rely on information gained in the prior representation) or in the situation presented at the first trial with Mr. Stern and Mr. Hammond,[10] disqualification was not warranted here. 851 A.2d at 487–88. Again, we are cognizant of the possibility that "trial courts confronted with multiple representations face the prospect of being 'whip-sawed' by assertions of error no matter which way they rule." *Wheat, supra,* 486 U.S. at 161, 108 S.Ct. 1692. We hold that Mr. Gilbert was not deficient in failing to withdraw based upon a potential conflict of interest.[11]

Second, even assuming Mr. Gilbert's representation was deficient, Mr. Freeman has not demonstrated that the potential conflict prejudiced Mr. Freeman's case. Mr. Freeman alleges that Mr. Gilbert's failure to withdraw enabled the government to cross-examine Mr. Miller about the prior representation and to argue that Mr. Miller was testifying favorably for the defense out of his gratitude to Mr. Gilbert for Mr. Miller's acquittals. Even if Mr. Gilbert had taken the action that Mr. Freeman argues he should have (i.e., withdrawn), Mr. Miller's testimony still would have been impeached by the government's cross-examination that Mr. Gilbert was the reason he initially became involved with the case and that he was testifying favorably out of his gratitude for his acquittal. The trial court noted that Mr. Miller's credibility as a witness had been impeached in ten ways other than his alleged debt of gratitude to Mr. Gilbert and, therefore, "th[e] single additional point of bias cross-examination which was afforded due to the prior representation[] simply doesn't rise to the level of significance in terms of prejudice analysis [, because t]here is simply no 'reasonable probability that [Mr. Freeman] would have been found not guilty but for the [alleged] error of counsel.'" A different outcome was not reasonably likely given testimony that Mr. Freeman confessed to four individuals, including Mr. Thomas, on separate occasions about committing the crimes and testimony from two eyewitnesses who saw Mr. Freeman leave the apartment and hide a gun on his person on the night of the crimes.

Therefore, the trial court did not abuse its discretion in denying Mr. Freeman's § 23–110 motion without a hearing because the records and files of the case demonstrates that Mr. Freeman has not established either deficiency or prejudice.

## III. CONCLUSION

For the foregoing reasons, the judgments of the trial court are

*Affirmed.*

---

**10.** Mr. Stern might rely on similar information gained in the prior representation in his examination, or he might base his decisions to object or conduct re-direct examination on information gleaned from the prior representation, in inculpating Mr. Hammond in order to exculpate Mr. Freeman.

**11.** Because we hold that the potential conflict of interest did not reach the point where disqualification was warranted, we need not reach the issue of whether the proffered waivers were sufficient.